Filed 11/17/22  P. v. Alcaraz CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# COURT OF APPEAL, FOURTH APPELLATE DISTRICT

# DIVISION ONE

# STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. JOHN ALCARAZ, Defendant and Appellant. | D078395 (Super. Ct. Nos. SCD278990, SCD279526) |

APPEAL from a judgment of the Superior Court of San Diego County, Michael S. Groch, Judge.  Affirmed.

Russell S. Babcock, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Kelley Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

## I.

## INTRODUCTION

Defendant John Alcaraz appeals from a judgment of conviction entered after a jury convicted him of four counts of robbery, four counts of conspiracy, one count of burglary, one count of grand theft, and one count of using personal identifying information of another.

Alcaraz raises five claims on appeal. First, Alcaraz argues that because a police officer unlawfully searched his cell phone after conducting a traffic stop of a vehicle in which Alcaraz was a passenger, the trial court should have traversed two search warrants that were obtained after the unlawful search and excluded all evidence obtained pursuant to those search warrants. Alcaraz contends that the affidavit submitted in support of the search warrants included some information that was obtained as a result of the prior unlawful cell phone search.

Second, Alcaraz contends that the trial court erred in permitting the "repeated admission" of the word "blood" at trial. According to Alcaraz, the references to the word "blood" constituted prejudicial gang evidence. Third, Alcaraz challenges the trial court's admission of a brief cell phone video in which a hand can be seen holding a firearm and pulling the trigger, as well as testimony regarding ammunition that police found in Alcaraz's bedroom. Fourth, Alcaraz contends that even if the court's admission of each item of challenged evidence was not prejudicial on its own, the admission of the challenged evidence, considered together, constituted prejudicial cumulative error.

Finally, Alcaraz contends that the trial court erred in denying his motion to sever the burglary and grand theft offenses, which arose out of a

burglary of an Apple Store, from the other offenses, which arose out of robberies of individuals.

We conclude that Alcaraz's contentions are without merit. We therefore affirm the judgment.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual background*

The testimony elicited at Alcaraz's trial demonstrated his participation in multiple robberies of individuals and the theft of cellular telephones (cell phones) and laptops from an Apple Store, all of which occurred over a 40-day period in July and August 2018. The evidence demonstrates that Alcaraz and a group of three to four accomplices attacked the victims and robbed them of items of value, including cell phones, wallets and gold chains.[1] The robberies all followed a similar pattern, occurring late at night, and often as a victim was leaving a party.

Police began to link Alcaraz and his accomplices to the robberies and to the burglary of the Apple Store when, on August 19, 2018, police stopped an Infiniti that Smith was driving. Alcaraz and Mall were also in the car at the time the stop took place. A police officer found several items that belonged to the robbery victims in the car and in Alcaraz's pockets.

---

[1] The accomplices to the crimes were identified as Robert Smith, Rashaad Jackson, Jamal Burton. Bahdoon Mall also participated in some of the crimes.

3

1. *The July 7, 2018 robbery of Y.S. (counts 1, 2)*

In July 2018, Y.S. was a student at San Diego State University.[2] At approximately 1:15 a.m. on July 7, 2018, Y.S. was returning to his apartment complex near campus when he noticed a group of four men at the complex. One of the men in the group approached Y.S. and asked him if he could borrow Y.S.'s cell phone—an iPhone X in a blue case—to make a call. Y.S. asked the man for the number and said that he would dial it for the man. As Y.S. was dialing, the man grabbed the cell phone from Y.S.'s hand. When Y.S. attempted to get his cell phone back, the group of men surrounded and attacked him.[3] During the attack, Y.S. managed to knock a beanie off of the head of the man who had taken the cell phone. Other men punched Y.S. in the face, kicked him, and "thr[ew] [and] swung [him] around." When Y.S. tried to get up, one of the men stepped on his head. The men left, taking Y.S.'s cell phone

As a result of the attack, Y.S. received five stitches around his eye and had a lump on his head that was still noticeable a year after the attack. Y.S. could not describe the physical appearance of any of the assailants.

Evidence found on Alcaraz's cell phone linked him and some of his accomplices to the robbery of Y.S. For example, Alcaraz sent a text message that said, "Going towards State" on July 7, 2018, at 12:41 a.m., which is approximately a half an hour before Y.S. was robbed in an area a couple of

---

[2]   Y.S. provided testimony at a conditional examination that took place prior to trial because he was going to be out of the country at the time of trial. A video of Y.S.'s conditional examination was played for the jury.

[3]   Y.S. testified that it was his impression that the people who attacked him were working together as a group.

4

miles from San Diego State. Seconds after Alcaraz sent this text, he received a response that said, "Oh, for another party?"[4]

Also, a video found on Alcaraz's cell phone that was created on July 7, 2018, at 12:07 a.m.—approximately an hour before Y.S. was robbed—shows Alcaraz with Smith. In the video, Smith can be seen wearing a beanie with a Polo logo that looks like the beanie that Y.S. removed from the head of one of the perpetrators, which police subsequently recovered.

Another video that was recorded on Alcaraz's cell phone a few minutes after Y.S. was robbed shows Alcaraz and has the caption, "Cuz got beat tf up." In the video, Smith can be seen holding a cell phone in a blue case. In a different video that was also recorded a few minutes after the Y.S. robbery, a voice can be heard saying, "SIM card, blood," and someone else says, "I took it out." Investigators found these comments significant because the removal of a SlM card from a cell phone prevents the phone's owner from being able to use the "find my phone" feature to locate the phone. Also in the same video, Mall is seen on camera saying, "Sounds like you all did it near my place." Mall lived seven-tenths of a mile from the location of the Y.S. robbery. Smith replies to Mall, "The Boulevard." The name of the apartment complex where Y.S. was robbed is Boulevard 63. Jackson, Burton, and Alcaraz can also be seen in that video.

A photograph on Alcaraz's phone that was created on July 7, 2018, at 2:03 a.m. shows Alcaraz and Smith holding iPhones; a caption on the photograph states, "My crash dummy got us money."

---

4    The question regarding a "party" was significant because other robberies that took place around the same time as the robbery of Y.S. occurred as victims were leaving parties.

2. *The July 11, 2018 Apple Store burglary and theft (counts 3, 4)*

At just before 9:00 p.m. on July 11, 2018, employees at an Apple Store in Chula Vista were preparing to close the store. Alcaraz entered the store with Smith, Jackson, and Burton. The men were wearing hooded sweatshirts with the hoods pulled up, and Alcaraz was holding his hand over his face. Two of the men walked to a table on which laptop computers were displayed. The other two men walked to the area where iPhones were displayed. Not long after the men reached their destinations, the men who were near the laptops grabbed laptops, and the men who were near the iPhones grabbed iPhone X's.

A store employee ran up to one of the men who had grabbed laptops and tried to pull the computers out of his hand. After some tugging, the store employee was able to recover three of the laptops. The men then ran out of the store. The entire incident took place in less than one minute. The men escaped with approximately $19,000 in Apple merchandise. None of the store employees who were present that night were able to identify any of the perpetrators of the thefts because the men had obscured their faces with their hoodies, and "it all happened very fast." However, surveillance video from inside the Apple Store captured the perpetrators committing the burglary and thefts.

Police found evidence linking Alcaraz to the Apple Store burglary on his phone. Just over an hour before the Apple Store burglary, someone sent a text message to Alcaraz asking, "So what are you doing again[?]" Alcaraz replied with "WYM."[5] A minute later, he messaged that person, saying,

---

[5] A detective testified that he understood the term "WYM" to be a way of saying, "What [do] you mean."

"Going in and get phones." Just after the Apple Store burglary was completed, Alcaraz received a text that said, "I want a phone" and "iPhone X omm."[6] Alcaraz responded with the word "Same." At 9:16 p.m., someone sent Alcaraz the following text: "How much money are you getting wtf?" Alcaraz responded, "Looks like a lot." A few minutes later, Alcaraz texted, "Probably a band each hopefully."[7]

In a video that was recorded on July 11, 2018, at 9:30 p.m. (i.e., 30 minutes after the Apple Store closed), Smith can be seen walking toward the camera fanning a wad of cash that appears to consist of mostly $100 bills. Jackson and Burton can also be seen on the video. Giovanni Garcia, who is a friend of Alcaraz, Smith, Jackson and Burton, is heard saying, "We got money like crash dummies." Alcaraz is heard saying, "Set."[8] In another video found on Alcaraz's phone that was taken on the night of the Apple Store burglary, Alcaraz is wearing a blue sweatshirt that looks like the one he can be seen wearing on the surveillance video from the Apple Store.

3. *The August 3, 2018 robbery of C.A. (counts 5 and 6)*

At approximately 10:00 p.m. on August 3, 2018, C.A. was walking near his home in Chula Vista when he noticed a party at a nearby house. C.A. had his cell phone in his hand as he was walking. He became aware of two men starting to follow him. One of the men approached C.A. on his right side and asked, " 'Is this your only addy?' " C.A. did not know what the word "addy"

---

[6]     The detective did not have an opinion as to what the term "omm" meant.

[7]     The detective testified that the term "band" is slang for $1,000.

[8]     The detective was not asked about the meaning of the term "Set."

meant and was confused by the question.[9] The man then grabbed C.A.'s phone out of his hand and ran off. The case on C.A.'s phone contained his credit cards and driver's license.

C.A. began to chase after the man. The other man who had been following C.A. said, " '[J]ust walk away.' " When C.A. continued to give chase, one of the men punched C.A. in the nose, knocking him to the ground.[10] The two men then ran away and got into the back of a car that drove off. C.A. went to a neighbor's house and called the police.

At 11:03 p.m. that night, C.A.'s debit card was used to make a $58.89 purchase of five cheeseburger combo meals at a Carl's Jr. restaurant in Chula Vista. The same Infiniti in which Alcaraz was a passenger when the police stopped the vehicle on August 19, 2018, appears on surveillance video from the Carl's Jr. restaurant that night. C.A.'s driver's license and Chase debit card were found inside the Infiniti when it was stopped on August 19.

A video found on Alcaraz's phone that was recorded on August 3, 2018, shows a Carl's Jr. receipt for a $58.89 purchase. The same video also shows C.A.'s debit card and driver's license. Alcaraz and Smith can be seen in the video.

Someone texted Alcaraz on August 3, 2018, at 8:49 p.m. asking, "What addies you going to[?]" Alcaraz responded, saying that he did not know. A little bit later, Alcaraz received a text that said, "You better get some money, Jacob," to which Alcaraz replied, "I know." At 9:22 p.m., someone texted Alcaraz saying, "I hope you get a X." Alcaraz responded, "Same." At 10:41 p.m., Alcaraz sent a text in which he said, "It's a party but they not

---

9    A detective testified that the term "addy" means a party.

10    C.A. did not identify which of the men punched him in the nose.

8

letting anyone in." At 10:46, Alcaraz received a text that said, "Wow," followed moments later with a text that said, "Rob then."

4. *The August 12, 2018 robbery of J.L. (counts 7, 8, and 9)*[11]

J.L. is a Marine who was stationed at Camp Pendleton in mid-August, 2018.[12] Late at night on August 11, 2018, J.L. attended a party in Fallbrook with his friends and fellow Marines, I.C. and T.M. The men had learned about the party from a flyer posted on Instagram. J.L. noticed a group of six or seven men who were hanging out together at the party but not socializing or talking to anyone else. Around midnight or 1:00 a.m., the party ended and everyone began to leave. As J.L. and his friends were walking to their car, they saw a crowd of people blocking the roadway. Someone was firing gunshots into the air and at cars. J.L. was "kind of amazed, kind of astonished" to see that in one area, people appeared to be "getting jumped," and in another location, there were "people jumping on other people's cars."

As J.L. and his friends continued walking toward their car, a group of five to seven men came up to J.L. and his friends and "pull[ed] [them] to the side, pull[ed] out their guns, and they're like, 'Run your pockets,' and start[ed] patting" the victims' pockets. The men were "barking at" J.L. and his friends "like drill sergeants." One of the men said, "Run [your] pockets, blood. What you got in your pockets, blood?" Another man pointed a gun at J.L.'s stomach. One of the men took J.L.'s wallet, which contained his Government Travel Charge card, driver's license, and debit card. A different

---

[11] Although the evidence demonstrated that more than one victim was robbed by the same group of perpetrators on August 12, 2018, Alcaraz was charged with offenses related only to the robbery of victim J.L.

[12] J.L. testified at a conditional examination. The video of that examination was played at trial.

man asked J.L., " 'What boots you got on? You got Tims? Let me get them Tims.' " The men took J.L.'s boots. J.L. recognized the men who were robbing him as the same men he had seen at the party hanging out together and not socializing with anyone else.

While some of the men were robbing J.L., someone else pointed a gun at I.C. and said, " 'Give me everything you have.' " The man took I.C.'s watch and his wallet, which contained I.C.'s credit cards, driver's license and social security card.[13] Around the same time, someone reached into T.M.'s pockets and took his iPhone and his wallet, which contained a driver's license, debit card, military ID, and other cards. A different man came up behind T.M. and "snatched" a gold chain off of his neck, causing the clasp to break. The group of men left together after robbing J.L., I.C., and T.M.

J.L.'s Government Travel Charge card was used to purchase six chicken meals at a restaurant called Raising Cane's at 2:26 a.m. on August 12, 2018. A video found on Alcaraz's cell phone that was recorded around the same time as the food purchase from Raising Cane's depicts a receipt from that restaurant. Alcaraz can be heard on the video saying, " 'Blood, Cane's on me.' " When the video was shown to J.L., he confirmed that it was his wallet and credit card that appeared in the video. J.L. said that the language he heard being used by the individuals depicted in the video was consistent with the language that the robbers had used, including the use of the word "blood" to refer to other people.

Alcaraz's cell phone contained evidence that the phone had been used to search for the location of a Raising Cane's restaurant at 2:05 a.m. that morning. Surveillance video from the Raising Cane's restaurant shows that

---

13    I.C. also testified at a conditional examination. His recorded testimony was used at trial.

the same Infiniti that police eventually stopped on August 19, 2018 went through the restaurant's drive-through at 2:24 a.m. on August 12, 2018.

Police found credit cards belonging to I.C. and T.M. in the Infiniti when they stopped the vehicle on August 19, 2018. Police searched Alcaraz's room later that day and found J.L.'s wallet and cards on Alcaraz's dresser.

Police found a video on Alcaraz's phone that depicts a hand holding a silver revolver and "dry firing"[14] the gun; the video was recorded on May 9, 2018. A detective testified that the hand holding the silver revolver was Alcaraz's hand. Copper tips of live small caliber bullets can also be seen in video. When I.C. was shown the video, he testified that the gun that appeared in the video looked similar to the gun that was pointed at him during the robbery.

5. *The August 18, 2018 robbery of B.R. (counts 10, 11)*

On August 18, 2018, B.R. and two friends went to a party near Alvarado Road. They learned about the party on Snapchat or Instagram. One of the draws to the party was that a rapper named Blueface was going to be there. As the group was walking up to the party, it was "chaos," in that people were running around and "acting kind of crazy." Three or four men approached B.R.'s group of friends. One of the men asked one of the friends what kind of phone he had. When the friend showed the man his cracked iPhone 6, the man asked the friend if he had any money. The friend gave the man $10 from his pocket. One of the men then asked B.R. what kind of phone he had. B.R. said that he had an iPhone 6, but in actuality he possessed an iPhone 7 Plus. The man told B.R. to show him the cell phone, and when B.R. did, the man grabbed the phone out of B.R.'s hand.

---

14    "[D]ry firing" a gun means pulling the trigger when there are no bullets in the cylinder.

11

Four to six men then surrounded B.R., and someone punched him in the back of the head. B.R. was punched several more times and fell to the ground. B.R. pulled out his wallet and handed it to one of the men, hoping that would make the attack stop. B.R.'s wallet contained his debit card and health insurance card. Someone eventually helped B.R. to get up off of the ground. As B.R. was leaving the scene, a man ran up to him and "snatched" the gold and silver chains that B.R. was wearing.

When police searched Alcaraz's person on August 19, 2018, they found B.R.'s debit card in his pocket, as well as a gold chain with a broken clasp. B.R.'s wallet and health insurance card were found inside the Infiniti, under the seat in which Alcaraz had been sitting. One of B.R.'s chains was found on the floor on the passenger side of the Infiniti.

Texts and videos found on Alcaraz's phone also tended to link Alcaraz to the robbery of B.R. and his friend. On August 18, 2018, at 2:50 p.m., Alcaraz sent a text message to someone in which he said that the rapper Blueface was going to be at a party and he wanted to go to the party. Alcaraz recorded a video on his phone later that night; geographic data from the video indicated that Alcaraz was thirteen one-hundredths of a mile from the party when he recorded it. There were also videos on Alcaraz's phone that were recorded during Blueface's performance at the party. In addition, Alcaraz had a photograph of a flyer on his phone advertising the August 18, 2018 party on Alvarado Road, and Alcaraz mentioned the rapper Blueface on Snapchat. Further, the day after the robbery, Alcaraz exchanged texts with someone regarding gold and silver chains.

12

6. *Police stop of the Infiniti on August 19, 2018; additional evidence obtained through further investigation*

San Diego Police Officer Aziz Brou was on patrol on August 19, 2018, at approximately 5:20 p.m., when he observed a silver Infiniti on University Avenue in San Diego with a "huge dent" or crack in the front windshield. Brou stopped the car after it turned onto on Euclid Avenue.

Smith was in the driver's seat, Alcaraz was in the front passenger seat, and Mall was in the rear passenger seat behind Smith. Officer Brou noticed dried blood on parts of the car's interior and exterior and broken glass on the seats. The rear passenger side window was broken. In addition, Smith had blood on his shirt and what "looked like a stab wound" on his back.

Officers conducted a consensual search of the car, during which they found the items described in the previous sections. In addition, officers found a receipt for a gold chain issued by a nearby pawn shop. The receipt was dated August 19, 2018, and had been issued just a few minutes prior to the time Brou initiated the traffic stop.

In Mall's pocket, police found $50 in cash and a pawn receipt that had been issued approximately 30 minutes prior to traffic stop for a transaction involving a 14-karat gold chain pawned for $185.

Later that day, officers conducted a "lawful search" of Alcaraz's bedroom. In a dresser, they found an identification card in Alcaraz's name and a magazine for a firearm that would fit in a handgun. The magazine contained eight live rounds of 9-millimeter ammunition. Officers also found an empty iPhone case. On top of the dresser, police found J.L.'s wallet, which still contained J.L.'s bank and identification cards. Police found four spent .22 caliber shell casings in a desk drawer in the bedroom.

13

Employees of two pawn shops testified that Mall had pawned several gold chains with broken clasps in exchange for cash at their stores between July 1 and August 19, 2018. Surveillance videos from the pawn shops show Alcaraz with Mall, Smith, and others on July 1, July 8, August 17, and August 19, 2018.

A subsequent search of Alcaraz's phone completed pursuant to warrants obtained by police revealed the videos, text messages, and social media posts that linked him to the robberies.

7. *Defense Evidence*

Alcaraz called a single witness, Robert Aguero, who testified as an expert on cell phone data.[15] Aguero testified about how cell phones work and how cell phone towers transmit information and connect with cell phones. Through Aguero's testimony, Alcaraz sought to call into question whether he could have been present at the times of three of the robberies, given how Alcaraz's cell phone had connected with cell phone towers during the relevant time periods. Defense counsel argued that Alcaraz was guilty of the crimes related to the burglary of the Apple Store (counts 3 and 4), but that he could not be found guilty of the robberies because the evidence of his participation in them was insufficient. According to defense counsel, Alcaraz could be found guilty, at most, of receiving stolen property, given that he was found in possession of the some of the property that had been taken from the robbery victims.

---

[15] Although this defense witness's testimony comprises more than one hundred pages of the reporter's transcript, it is not directly relevant to the issues raised on appeal. We therefore provide only a brief summary of the testimony.

B.  *Procedural background*

On June 28, 2019, a jury convicted Alcaraz of four counts of robbery (Pen. Code,[16] § 211; counts 1, 5, 7, 10); four counts of conspiracy (§ 182, subd. (a)(1); counts 2, 6, 8, 11); one count of burglary (§ 459; count 3); one count of grand theft (§ 487, subd. (a); count 4); and one count of use of personal identifying information (§ 530.5, subd. (a); count 9).

At the sentencing hearing, the court imposed a sentence of six years eight months,[17] ordered the sentence suspended for five years and placed Alcaraz on probation.  Included in the terms of probation was the requirement that Alcaraz serve 365 days in local custody, to be served concurrently with a one-year term imposed in a separate case (case No. SCD281672).

Alcaraz filed a timely notice of appeal.

III.

DISCUSSION

A.  *The trial court did not err in denying Alcaraz's motions to suppress evidence obtained pursuant to search warrants that permitted police to search Alcaraz's cell phone and certain other electronic data*

Alcaraz contends that Officer Brou's warrantless search of his cell phone during the August 19, 2018, traffic stop violated the Fourth

---

[16]  Further statutory references are to the Penal Code unless otherwise indicated.

[17]  The six-year eight-month term comprised the midterm of three years on count 1, a consecutive eight-month term on count 3, a consecutive one-year term on count 5, a consecutive one-year term on count 7, and a consecutive one-year term on count 10.  The court also imposed a concurrent two-year term on count 9.  The court stayed sentence on counts 2, 4, 6, 8 and 11 pursuant to section 654.

Amendment. He asserts that Detective Sidhu used the information obtained in this unlawful search to obtain two search warrants, which permitted officers to complete a forensic download of the content of Alcaraz's cell phone. According to Alcaraz, because the warrants were based on information obtained as a result of Officer Brou's unlawful search, the trial court should have concluded that the search warrants were invalid and should have suppressed the evidence found on the cell phone as the fruits of Officer Brou's unlawful search.

1. *Additional background*

Prior to trial, Alcaraz filed a "Motion to Suppress Evidence, and Traverse and Quash Search Warrants" pursuant to section 1538.5. Alcaraz moved to suppress all of the evidence found on his cell phone that connected him to the robberies and assaults, contending that police violated his Fourth Amendment rights by "going through" his cell phone "prior to obtaining a warrant." Alcaraz argued that the fact that he was on probation with an active Fourth Amendment waiver did not allow police to conduct a warrantless search of his cell phone. According to Alcaraz's motion, "all of the evidence alleged to have been seized from the telephone without a warrant represents the fruits of this unlawful search and seizure."

In Alcaraz's motion to quash and traverse search warrant Nos. 58116 and 60099, he made the related argument that the affidavits supporting the warrants "were made defective and illegal by the fact that the probable cause is based largely on information that is a product of a prior unlawful search and seizure of [Alcaraz's cell] phone conducted without a warrant."[18] Alcaraz

---

[18]     Search warrant No. 58116 involved forensic examinations of cell phones belonging to Alcaraz, Smith, and Mall. Search warrant No. 60099, which was requested after search warrant No. 58116 had been issued and

attached to his motion the affidavit and court order for search warrant No. 58116, the affidavit and court order for search warrant No. 60099, and the April 4, 2017 minute order from Alcaraz's disposition hearing, which listed the terms and conditions of his probation.

The prosecutor opposed Alcaraz's motion, but conceded that "officers mistakenly believed that the defendant's Fourth Waiver status extended to cellular phones and, on the day of the vehicle stop, conducted a search of the defendant's cellular phone." The prosecution's position was that the search warrants were not rendered wholly invalid because they were obtained, in part, as a result of Officer Brou's illegal search of Alcaraz's cell phone. According to the prosecution, the proper "remedy is to excise any observations and information derived from the mistaken belief that the defendant's probation conditions extended to his cellular phone from the affidavit to determine whether the remaining information is sufficient to establish probable cause."[19] As the prosecutor explained, "The seven and a half pages of probable cause includes evidence regarding stolen property found in the defendant's bedroom, facts pertaining to the recent robberies associated with that stolen property, facts demonstrating that the perpetrators of the robberies were armed, evidence showing that the defendant had ammunition in his bedroom, evidence showing that property from recent robbery victims

---

searches had been undertaken pursuant to it, involved "Snapchat" records for three "profile IDs."

[19] The prosecutor cited *Franks v. Delaware* (1978) 438 U.S. 154, *Murray v. United States* (1988) 487 U.S. 533, and *People v. Weiss* (1999) 20 Cal.4th 1073, in support of its contention that the search warrants were based on "multiple grounds," and that the proper remedy was to excise observations and information obtained through the improper search of Alcaraz's cell phone.

was found in the silver Infinit[i] (within reach of all the occupants), evidence pertaining to [the] pawning of stolen items, and evidence connecting the vehicle to recent Apple Store robberies."

The trial court conducted a hearing on Alcaraz's motion to suppress evidence and quash and traverse the warrants. The parties stipulated that "the initial search was done of [Alcaraz's] cell phone without a search warrant." The prosecutor called Officer Brou and Detective Amalia Sidhu to testify at the hearing.

Officer Brou testified that at approximately 5:20 p.m. on August 19, 2018, he observed a silver Infiniti traveling east on the 4700 block of University Avenue. Brou noticed that the windshield of the Infiniti was "pushed in" with "spider-webbed" cracks, and testified that such damage to a windshield constitutes a Vehicle Code violation. Brou also observed that a pair of goggles was hanging from the rearview mirror. This also constitutes a Vehicle Code violation. Brou conducted a vehicle stop of the Infiniti.

Smith was driving the car, Mall was seated behind Smith, and Alcaraz was in the front passenger seat. Smith gave Brou permission to search the Infiniti.

Meanwhile, another officer conducted a record check on the car's occupants and discovered that Alcaraz was on probation. Based on Smith's consent and Alcaraz's probation status, Officer Brou and other officers conducted a search of the car. While searching the car, Brou discovered driver's licenses and other identification cards of individuals who were not in the car and who were victims of robberies that had recently occurred. Officers also found a receipt from a nearby pawn shop with Mall's name on it.

Because Alcaraz was on probation with "a Fourth waiver," and because of "everything that was found in the vehicle," Brou decided to search

18

Alcaraz's phone. Brou mistakenly believed that Alcaraz's probation conditions permitted officers to search Alcaraz's cell phone. Brou was not aware of the Electronic Communications Protection Act ("ECPA") or its application to the search of Alcaraz's cell phone.

Brou acknowledged that he did not obtain consent to search Alcaraz's cell phone. Brou explained that he was concerned about the blood that he observed on the car, as well as the damage to the car, and he knew that "with cell phones and social media, a lot of people will post a lot of the stuff that they do even if it has to do with them committing a crime. And a lot of times . . . whether it was a hit and run or a fight, it will help lead us to what happened to the car, why there is blood on the car, as well as the stolen property inside of the vehicle."

When Brou searched Alcaraz's phone, he saw text messages that related to Smith being stabbed and a video of Smith with a gold chain. The caption on the video indicated that Smith "had ripped the chain off of somebody at a grocery store." Brou also found a video of four people in the car with Alcaraz at a Cane's restaurant with J.L.'s credit card. On the video, Alcaraz bragged about J.L. paying for the food.

Brou called Detective Sidhu and she responded to the scene. Sidhu testified that in August 2018, she had been assisting in the investigation of a series of recent robberies and Apple Store thefts. When she arrived at the location where Officer Brou had stopped the Infiniti, she observed items that were taken during the recent robberies.

Detective Sidhu explained that after Brou had effectuated the August 19, 2018 traffic stop, she continued her investigation into the various

19

robberies and thefts.[20] She testified about all of the information that she gathered during her investigation, and explained that she used all of the information obtained during her investigation when she prepared the affidavit for the search warrant for a forensic download of Alcaraz's cell phone. Sidhu acknowledged that she had become aware of some of the videos and other items that Officer Brou found on Alcaraz's cell phone when he searched the phone on August 19, 2018, and acknowledged that she had incorporated some of that information into her search warrant affidavit. However, Sidhu further testified that even if she had not become aware of any of the things that Brou found on Alcaraz's cell phone, she still would have sought a search warrant for Alcaraz's cell phone based on the information that she had gathered in her investigation and the items found in the Infiniti during the traffic stop. Sidhu explained that, based on the information she had at the time of the traffic stop on August 19 and information she obtained within a few days after the stop, she believed that there would be more information on Alcaraz's cell phone that would be of evidentiary value and could possibly assist her in solving other crimes, such as "additional victims, photographs of maybe areas of where they were."

Sidhu signed a search warrant affidavit on August 28, 2018, and the judge authorized a warrant to search Alcaraz's cell phone that day. Sidhu did not know, either on August 19 or August 28, 2018, when she applied for a search warrant, that the Fourth Amendment waiver to which Alcaraz was subject was "limited to things other than electronic devices." Sidhu also testified that she did not know that the ECPA limitations were in place as of

---

20    Later on August 19, 2018, Brou and other officers conducted a search of Alcaraz's residence, pursuant to the Fourth Amendment waiver applicable to him based on his probationary status.

August 28, 2018. After Sidhu obtained the search warrant for Alcaraz's phone, she submitted it to the police department's forensics unit to conduct a forensic download of the phone.

The prosecutor argued that Officer Brou reasonably believed that Alcaraz's Fourth Amendment waiver included his cell phone and thus, that the good faith exception to the exclusionary rule should apply. Alternatively, the prosecutor contended that even if the court determined that Brou's search of Alcaraz's cell phone was unlawful and conducted without a good faith belief in its lawfulness, there was sufficient probable cause to support the application for the search warrants even if all of the information that was derived from Brou's search of Alcaraz's cell phone was excised from the affidavit in support of the search warrant.

Defense counsel argued that good faith was irrelevant where an officer fails to "keep up on the law," and that Officer Brou's lack of awareness of the ECPA, which went into effect in 2016, was insufficient to support a conclusion that Brou had a reasonable belief in the lawfulness of his search of Alcaraz's cell phone. Defense counsel further argued that without the information that Brou obtained unlawfully, the affidavit supporting the search warrant did not provide any indication that evidence of a crime could be found on Alcaraz's cell phone.

The trial court explained that the court's analysis required a determination as to whether Officer Brou's search of the cell phone "was lawful or unlawful and if unlawful, what flows from that." The court determined that Brou had not acted in bad faith in searching the cell phone, in that Brou had "no ill will and [engaged in] an attempt to follow the law as he understood it to be." However, the court further noted that the situation in this case was "unlike a situation where a police officer . . . reli[es] on

21

someone else's mistake," because the mistake was Brou's, and this distinction was significant. Given that Brou misunderstood the law and that his misunderstanding was not due to a recent change in the law, the court concluded that the warrantless search of Alcaraz's cell phone was unlawful and that evidence obtained as a result of the unlawful search must be suppressed.[21]

However, the trial court did not agree with the defense that the evidence obtained pursuant to the search warrants had to be suppressed. The court explained that in order to determine whether suppression of that evidence was warranted, the court would need to "examine the affidavit, and absent bad faith, reckless behavior, some nefarious actions by the detective of which there are none -- she also acted in good faith -- excise out any information received as a result of Officer Brou's observations and then make a determination as to whether probable cause still exists." The court undertook such an analysis, and noted that the affidavit contained "discrete references to Officer's Brou's observations," which the court identified by line and page numbers, that constituted the information that would have to "be excised out." The court explained that it was excising the following information from Sidhu's affidavit: page 6, lines 20-25; page 7, lines 4-5; page 8, line 8, beginning with the words "the magazine," through the end of line 9, line 12, starting with the word "which," and ending on line 14 with the word "food," and page 8, line 15. The attorneys for both parties agreed that the court had removed "all the direct references to Officer Brou's observations."

---

[21] The trial court noted that for purposes of trial, Officer Brou would not be permitted to "testify as to what he did the moment he took that phone and [about] what he saw on it and its contents that he observed."

The trial court explained that under the portion of the affidavit titled "Opinions and Conclusions," Detective Sidhu "is justifying why she thinks . . . , based on her training and experience, the items of evidence that she has articulated will likely be found or there's probable cause to believe they will be found on the device that she's asking to search." The court continued, "She's not referencing anything specific to this investigation. And she's talking about her training and experience showing that analysis of cell phones will reveal evidence or additional victims of robberies, evidence taken from these robberies, possession of firearms, et cetera. She also relies on her training and experience when she opines that images or data stored on digital devices may exist even if they have been erased. She also opines based on her training and experience, not . . . Officer Brou's observations, that computers [*sic*] are basically small computers. They have the ability to send text messages, store vast quantities of information. And she opines, based on her training and experience, that cellular telephones could have been used to communicate with additional unidentified suspects. [¶] She also opines, not referencing Officer Brou's observations but her training and experience in general, that criminal acts will often be boasted about by criminals using electronic devices, verbally, e-mails, instant message[s], texts, et cetera, and that in her training and experience these documents and items can be found on devices such as the ones she was seeking to search." The court noted that in that portion of the affidavit, Sidhu made "no reference to Officer Brou," but instead based it "on her collective years of training and experience."

The trial court denied Alcaraz's motion to quash search warrant No. 58116. The court explained, "[A]s I analyze the affidavit for probable cause, excising out the portions that I've already articulated, there is more

than substantial evidence that supports probable cause for a search of all three of these phones.[22] . . . [T]hat's where . . . the additional investigation that [Detective Sidhu] completed and relayed in this affidavit matter. There is ample evidence that would support a judge signing this search warrant with these sections excised without really any hesitation." The court proceeded to consider warrant No. 60099, and concluded that the same analysis applied with respect to that warrant.[23]

The trial court concluded by noting that it was not finding that the officers involved had made any false statements "knowingly or intentionally or with a reckless disregard for the truth that would support traversing either of the warrants." The court therefore denied Alcaraz's motion to traverse the two warrants.

2. *Analysis*

The trial court determined that Officer Brou's search violated the ECPA and suppressed the evidence that Brou obtained through his search of Alcaraz's cell phone. The court then excised the information attributable to Brou's unlawful search of the cell phone from Detective Sidhu's affidavit filed in support of the search warrant applications and considered whether, without the excised information, the affidavit contained sufficient facts constituting probable cause to support the issuance of the warrants requested. In doing so, the court considered only information that had been

---

22    The court's reference to three phones arose from the fact that in the affidavit, Detective Sidhu was seeking to support warrants to search not only Alcaraz's cell phone, but also the cell phones belonging to Smith and Mall.

23    The court stated, "I agree with both counsel that whether the second warrant remains valid and viable . . . rises and falls on the decision regarding" the first warrant.

lawfully obtained and recited in Sidhu's affidavit, and concluded that the information in the affidavit provided ample probable cause to support issuing the warrants.

Alcaraz concedes that the trial court's ruling was correct insofar as the court suppressed all of the evidence that Officer Brou obtained during his initial search of Alcaraz's cell phone.[24] Alcaraz takes issue with the court's *subsequent* conclusion that, after excising the evidence obtained through Officer Brou's unlawful search of the cell phone, sufficient information remained in the affidavit to establish probable cause to support the warrants. According to Alcaraz, "[m]aterial facts were omitted from the affidavit for the search warrant—namely that appellant'[s] cell phone had already been previously searched without a warrant and that much of the information discovered in these cases stemmed from that search." Alcaraz complains that Detective Sidhu "was either deliberately false, or at a minimum acted in reckless disregard of the truth" because she represented the facts obtained by Officer Brou as having been "legal 'fruits' of a legal search," even though the initial search of Alcaraz's cell phone was unlawful. Alcaraz further argues that once the "tainted observations of Officer Brou are excised from the warrant, what is left is essentially a curriculum vitae of [Detective] Sidhu," and argues that this is insufficient to constitute probable cause to support the issuance of a warrant. According to Alcaraz, the trial court should have

---

24    The People agree that the trial court properly excised from Detective Sidhu's affidavit all of the evidence that Officer Brou obtained as a result of his warrantless search of Alcaraz's cell phone, and assessed whether the remainder of the affidavit established probable cause. (See, e.g., *People v. Werner* (2012) 207 Cal.App.4th 1195, 1213 ["Under the 'fruit of the poisonous tree' doctrine, both direct and indirect products of an unreasonable search are subject to exclusion," and the rule " 'logically ought to bar the use of such evidence to support the issuance of a search warrant' "].)

25

granted his motion to suppress all evidence that police obtained pursuant to the search warrants that were issued in reliance on Detective Sidhu's affidavit.

In reviewing a trial court's ruling on a motion to suppress evidence, "[w]e defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment." (*People v. Glaser* (1995) 11 Cal.4th 354, 362.)

Where an affidavit supporting a search warrant contains information derived from unlawful conduct as well as other untainted information, "the reviewing court must excise all tainted information but then must uphold the warrant if the remaining information establishes probable cause." (*People v. Weiss* (1999) 20 Cal.4th 1073, 1081.) Probable cause exists for a search warrant when "there is a fair probability that contraband or evidence of a crime will be found in a particular place" to be searched. (*Illinois v. Gates* (1983) 462 U.S. 213, 238 (*Gates*).) A reviewing court accords great deference to the magistrate's determination regarding probable cause. (*Id.* at p. 236; *People v. Kraft* (2000) 23 Cal.4th 978, 1041.) The task of the magistrate issuing a search warrant is "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . [concluding]' that probable cause existed." (*Gates*, at pp. 238-239 [magistrate may draw reasonable inferences from the material supplied by the affiant].) The

sufficiency of the search warrant affidavit is evaluated in light of the totality of the circumstances. (*Id.* at p. 238.)

We disagree with Alcaraz's assertion that the content that remained in Detective Sidhu's affidavit, after the excision of all evidence that resulted from Officer Brou's initial illegal search of Alcaraz's cell phone, was insufficient to establish probable cause and that all evidence obtained pursuant to the search warrants should have been suppressed. After the unlawfully obtained material was excised, significant content remained. Detective Sidhu attested that she learned that on August 19, 2019, San Diego police stopped an Infiniti in which Alcaraz, Smith, and Mall were riding. In the Infiniti, police found driver's licenses in the names of D.B. and C.A. A records check revealed that D.B. had been robbed in San Diego on August 17, and C.A. had been robbed in Chula Vista on August 3, 2018.

The following day, Detective Sidhu read a police report regarding the D.B. robbery. The report reflected that D.B. had been at a large party on August 17, 2018, when she was confronted by a group of men. After a physical altercation, the men stole her cell phone and purse. Police found not only D.B.'s driver's license in the Infiniti on August 19, 2018, but also other items belonging to D.B. in the vehicle. Detective Sidhu also read the police report for the C.A. robbery, which indicated that C.A. had been robbed on August 3, 2018, as he was leaving a friend's house. C.A. had been approached by a man who asked him if this was his " 'only addy?' " The man then grabbed C.A.'s cell phone. When C.A. tried to get his phone back, the man punched him in the face. The man also took C.A.'s driver's license and debit card. C.A.'s debit card was used at a Carl's Jr. at 11:30 p.m. that night. Sidhu learned that video surveillance from the Carl's Jr. where the debit card

was used showed that someone in the Infiniti had used the card to purchase food. In addition, C.A.'s driver's license was found in the Infiniti.

On August 21, 2018, Detective Sidhu learned from another detective that friends and co-Marines J.L., I.C., and T.M. had been robbed at gunpoint on August 12, 2018, after attending a party in Fallbrook. The perpetrators took the victims' credit cards, wallets, money and iPhones. Officers found debit cards belonging to I.C. and T.M. in the Infiniti on August 19, 2018. Police found J.L.'s wallet, military ID, and other bank cards in Alcaraz's bedroom during the lawful search that had been conducted on August 19, 2018. Police also found a black handgun magazine loaded with eight rounds of 9mm ammunition in Alcaraz's room, as well as four spent .22 caliber casings.

Detective Sidhu had also become aware of the fact that when police searched Alcaraz's person on August 19, 2018, they found a gold chain with a broken clasp and a Union Bank card in the name of a robbery victim in Alcaraz's pocket. Sidhu also recounted the discovery of pawn shop receipts from August 19, 2018 on Mall's person and in the Infiniti.

Detective Sidhu learned that on August 21, 2018, another detective contacted the pawn shops that were listed on the receipts found on August 19, 2018, and discovered that Mall had recently pawned eight chains at two pawnshops. All of the chains had broken clasps.

On August 22, 2018, Sidhu contacted a detective with the Costa Mesa Police Department who informed her that on July 23, 2018, five men in hooded sweatshirts entered an Apple Store in Costa Mesa and stole cell phones and computers. Surveillance video showed the men leaving in the same Infiniti that police stopped on August 19, 2018.

28

Also on August 22, 2018, Sidhu learned from a detective in Carlsbad that on July 13, 2018, four men entered an Apple Store in Carlsbad and stole 20 cell phones. A witness saw the men flee in an Infiniti that appeared to be the same vehicle that police stopped on August 19, 2018.

Detective Sidhu stated that, based on the evidence that became known to her, as well as her training and experience, she believed that a search of the cell phones at issue would reveal "evidence and/or additional victims of robberies," as well as "evidence taken from these robberies." Additionally, Sidhu believed that items related to the crimes, such as e-mails and texts about the criminal activity, could be located on the cell phones.

All of this information is more than sufficient to establish the probable cause necessary to support the issuance of the search warrants. We therefore reject Alcaraz's contention that the trial court erred in denying his motion to suppress all evidence obtained as a result of searches conducted pursuant to the challenged search warrants.

B. *The trial court did not abuse its discretion in admitting evidence that Alcaraz used the word "blood" when talking with his friends and in connection with the robberies*

Alcaraz contends that the trial court abused its discretion under Evidence Code section 352, and denied him his rights to due process and a fair trial, by allowing several witnesses to repeatedly use the "gang[-]related" word "blood" during their testimony, even though the case did not involve gang charges. According to Alcaraz, the testimony regarding the use of the word "blood" had little probative value, and was "extremely prejudicial."

1. *Additional background*

Prior to conducting video-taped conditional examinations of some of the witnesses in this case, defense counsel for Smith indicated that some of the witnesses who would be testifying had told police that the individuals who

robbed them said things such as " 'What's up blood?' " and " 'Give me your Tims, blood.' " Smith's attorney argued that because the case involved no gang allegations, the witnesses should be precluded from providing testimony about whether the perpetrators appeared to be gang members or were wearing gang clothing, even though the witnesses had told police that the perpetrators had used the word "blood" in reference to another person during the robberies. Alcaraz's attorney joined in the motion.

In response to this argument, the prosecutor contended that the perpetrators' use of the word "blood" during the robberies was relevant to establish their identity, noting that Alcaraz used the word in a similar manner in a recording made after one of the robberies.

The trial court denied the motion without prejudice to allow defense counsel to raise the issue again at trial.

After the conditional examinations were completed but prior to trial, Alcaraz filed "motions in limine," one of which included a request to "limit and exclude gang evidence." However, the motion did not specify what "gang evidence" Alcaraz was seeking to exclude. At the hearing on the in limine motions, the trial court asked the prosecutor, "What gang evidence, if any, do the People anticipate producing?" The prosecutor explained, "In multiple robberies the victims describe gang [type] phrases being used, for example, 'blood.' When [one of the victims] was robbed, . . . he was told, 'Give me your Tims, blood,' and 'run your pockets, blood,' or something along those lines." Another robbery victim also heard the word "blood." The prosecutor continued, "In the defendant's own phone videos, he says the word 'blood' multiple times. I think that is evidence consistent with the identification of the defendant." The prosecutor explained that he was "not going to be going through field interviews about gang evidence, gang territory, gang nexus,

gang predicate offenses. None of that information will be covered, and it will be very limited to the fact that this is just what happened in these incidents. And so the robbery victims describe the word 'blood' being used multiple times. The defendant himself uses the word 'blood' several times."

After hearing from the prosecutor, the trial court said, "So it sounds like I won't even hear the word 'gang' uttered by anyone. It's just the terminology that the defendant uses and that one of the reporting parties uses, but we won't hear the word 'gang.'" The prosecutor responded that there was no gang allegation, and added that he was "not aware of what gang it would be." The prosecutor further commented that if there had been evidence linking these crimes to a gang, he would have filed a gang allegation. The court asked whether this was "a situation where the defendant and coconspirators are associated with the same gang?" The prosecutor responded, "No," and indicated that that "they seem to be just organizing themselves in the manner that gangs do and attacking victims in the manner that gangs do and using the verbiage of gangs. But they're not your typical 59 Brims or West Coast Crips." The prosecutor reaffirmed that he did not intend to elicit testimony that would indicate that Alcaraz was a gang member. After hearing this, the court stated that its tentative ruling was "to grant the motion [to limit and exclude gang evidence but] that the word 'blood' could be used. But we're not going to go into who claims that word, et cetera."

Defense counsel stated that he was unaware that the prosecutor had been planning to use evidence regarding the word "blood" only for identification purposes. As defense counsel explained, "we didn't know whether they were going to call some kind of expert to start giving opinions about all this language" or maybe admitting other types of gang evidence,

"[a]nd we're asking for that to be excluded. [¶] But understanding now the identification context, I think some information related to the fact that the use of the word 'blood' is quite common among young men whether they're in a gang or not is a relevant inquiry to defeat the identification argument [the prosecutor] is putting forward."

The court agreed, indicating that defense counsel would be permitted to "ask witnesses who might know the answer, is 'blood' a term that teenagers use outside of an actual gang context, if you want to open that door and walk through it to prevent against any inference."

At trial, the jury heard the testimony that J.L. provided during his conditional exam. The prosecutor asked J.L. whether, during the robbery on August 12, he heard "anything about the Bloods at all?" J.L. testified that he heard someone in the group say, " 'Run my pockets, blood. What you got in your pockets, blood?' " J.L. was shown a video in which someone is heard saying " 'Blood, Cane's [*sic*] on me.' " J.L. testified that the language used by the person in the video was consistent with some of the language he heard used during the robbery, such as the use of the word "blood." T.M., who was with J.L. on August 12, 2018, testified that during the robbery, one of the perpetrators said, " 'We are bloods fam.' "

A detective testified that when he interviewed J.L. on the day of the robbery, J.L. told him that one or more of the men who perpetrated the robbery had made statements such as, "What's up, blood," "What you got in your pockets, blood," and "[G]ive me your Tims, blood."

Victim B.R. testified that as he was being robbed on August 18, 2018, he could hear the perpetrators saying, " 'What's up blood.' " One of B.R.'s friends who was present during the robbery testified that while the

32

perpetrators were beating B.R. and taking his belongings, the friend heard the men yelling, " '[B]lood, blood.' "

An investigator testified that in a video recording created on August 18, 2018 found on Alcaraz's phone, Alcaraz is heard saying, " 'I think you're boo, blood.' " Detective Sidhu testified that on August 19, 2019, the day after the robbery of B.R., Alcaraz sent a text from his phone that said, " 'I was going to keep this chain, but it's thin AF, blood.' "[25]

2. *Analysis*

The People contend that because Alcaraz failed to object to the references to the term "blood" at trial, Alcaraz has forfeited his contention on appeal that the trial court abused its discretion in permitting references to the word "blood" at trial. We agree that in failing to object to the prosecution's elicitation of witness testimony and video testimony involving references to the word "blood" being used to refer to another person, Alcaraz has forfeited his appellate challenge to the admission of this evidence. Alcaraz contends that if this court concludes that his trial counsel's failure to object to the references to the word "blood" at trial amounts to forfeiture of his claim, then trial counsel's failure to "renew" his objection constituted

---

[25] The parties initially disagreed in their briefing as to the number of references to "blood" in the trial transcript that were not references to the bodily fluid but rather, references to another person. Alcaraz contended in his opening brief that there were "no less than fifty-two mentions" of the word "blood" in the record made in reference to another person or people, while the People contended that there were 25 references to the word "blood" used in the challenged manner. However, in his reply brief Alcaraz agreed with the People that there are 25 references to the word "blood," as it is being used to refer to another person, in the trial transcript. Our review of the record is consistent with this.

ineffective assistance of counsel.[26]  Given Alcaraz's assertion of ineffective assistance of counsel in connection with the substantive claim of evidentiary error, we elect to reach the merits of his evidentiary contention rather than address the ineffective assistance of counsel claim, in the interest in judicial economy.  (See, e.g., *People v. Russell* (2010) 187 Cal.App.4th 981, 993; *People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7 [concluding it is unnecessary to address defendant's ineffective assistance claim where court considers the merits of the underlying issue]).)

Alcaraz's substantive claim is that the trial court abused its discretion in permitting the prosecution to elicit testimony regarding the perpetrators' repeated use of the word "blood" and in linking that testimony to the video evidence from the perpetrators' cell phones in which the same word was used repeatedly.  Alcaraz maintains that because this evidence amounted to gang evidence, it was far more prejudicial than probative.  We disagree with Alcaraz's assessment.

Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of

---

[26]  Defense counsel filed a motion in limine seeking to "limit and exclude gang evidence."  However, counsel's argument at the hearing on the motions in limine clarified that counsel was not registering an objection to the use of the word "blood" for identity purposes, as proposed by the prosecutor.  Rather, defense counsel indicated that he believed that the prosecutor was considering "call[ing] some kind of expert to start giving opinions about all this language or maybe admitting some *Killebrew* or *Sanchez*-type information," and that defense counsel was seeking to exclude that kind of evidence, not mere references to the fact that witnesses heard the perpetrators using the word "blood" in reference to another person, or digital data evidence demonstrating that Alcaraz and his friends used the word "blood" in reference to another person.  Defense counsel's objection to "gang evidence" was not an objection to the evidence that Alcaraz challenges on appeal.

the action." (Evid. Code, § 210.) Even where evidence may be relevant, a trial court nevertheless has discretion to exclude such evidence "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

" 'In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Bolin* (1998) 18 Cal.4th 297, 320.) Rather, "[e]vidence is substantially more prejudicial than probative [citation] if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome' [citation]." (*People v. Waidla* (2000) 22 Cal.4th 690, 724.) " ' "The prejudice that section 352 ' "is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." [Citations.]' " ' " " ' "[E]vidence [is] unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." ' [Citation.]" (*People v. Scott* (2011) 52 Cal.4th 452, 490-491.) A trial court's rulings under section 352 are reviewed for an abuse of discretion. (*People v. Leon* (2015) 61 Cal.4th 569, 597 (*Leon*).)

At trial, the prosecutor asked the victims what the perpetrators said during the robberies. The fact that the perpetrators used the word "blood" to refer to the victims themselves or to others was relevant to, and probative of, the identity of the individuals who perpetrated the robberies. The victims of these robberies were not able to visually identify the perpetrators of the robberies. However, multiple victims heard the perpetrators use the word

"blood" in reference to another person (either the victim or another person). And video and text evidence found on Alcaraz's cell phone showed that Alcaraz used the word "blood" in a similar manner. Thus, the evidence was probative of identity and was clearly admissible for this purpose.

Further, the trial court reasonably concluded that this evidence was not unduly prejudicial, and that any potential minimal prejudice that might result from its admission did not outweigh its probative value. Contrary to Alcaraz's contention on appeal, it is clear that this evidence was *not* presented as "gang evidence." There was no suggestion or other indication presented to the jury that Alcaraz or anyone else involved in the commission of these offenses was a member of a gang. Alcaraz contends that "[a]lmost anyone in Southern California knows that when someone refers to 'Blood,' and the context of the reference is not a liquid, it is a reference to a criminal street gang member." Although the use of the word "blood" in reference to a person could, in certain circumstances, refer to a member of a particular street gang, it is not used solely in that manner. As Alcaraz's trial counsel recognized "the word 'blood' is quite common among young men whether they're in a gang or not." Although trial counsel was raising that point to note the type of evidence that he could put forward to contradict the People's identification argument, the point remains that the use of the word "blood" was not used in a gang context by any witness at the trial in this case, and the mere mention of the word did not suggest to jurors that Alcaraz was a gang member.[27] We therefore reject Alcaraz's contention that the evidence

---

[27] The prosecutor's phrasing of the question to J.L. as to whether he had heard "anything about *the* Bloods at all" could have been understood to be a reference to the criminal street gang by that name. However, J.L.'s response made it clear that he heard the perpetrators using the word "blood" in reference to other people, only. Neither J.L.'s testimony nor the testimony of

regarding the perpetrators' use of the word "blood" to refer to another person and the digital evidence from Alcaraz's phone indicating his personal use of the word "blood" to refer to another person constituted unduly prejudicial "gang evidence." These references were not particularly inflammatory nor were they likely to have caused the jury to make decisions based on emotion rather than reason.

In sum, we reject Alcaraz's contention that the trial court abused its discretion in not excluding under Evidence Code section 352 all references to the word "blood," as used in reference to another person.

Alcaraz also asserts that the trial court's admission of evidence related to the word "blood," as used in reference to another person, violated his Fifth, Sixth and Fourteenth Amendment rights to a fair trial and due process. Alcaraz's constitutional argument is premised on his contention that the admission of this evidence was more prejudicial than probative and that the court abused its discretion in admitting it. We have rejected this argument; as a result, Alcaraz's constitutional claims also fail. (See *People v. Chhoun* (2021) 11 Cal.5th 1, 26 ["Because the court did not abuse its discretion under state law [with respect to evidence admitted at trial], defendant's constitutional claims also fail"].)

C. *The trial court did not abuse its discretion in admitting in evidence a video of a gun and testimony regarding a firearm magazine and other ammunition found in Alcaraz's bedroom*

Alcaraz contends that his robbery convictions should be reversed because the trial court abused its discretion and violated his right to due process by admitting a video showing Alcaraz's hand dry firing a revolver

---

any other witness suggested that the perpetrators of the robberies were affiliated with a criminal street gang.

that looked similar to a gun seen by one of the victims during the August 12, 2018, robbery, and by admitting testimony about a magazine and ammunition that police found when they searched Alcaraz's room. Alcaraz claims that this evidence was irrelevant and highly prejudicial.

1. *Additional relevant background*

I.C. testified that as his group was leaving the party on the night of the robbery, he heard someone firing gunshots into the air; T.M. also heard shots being fired. Soon after they heard the gunshots, someone pointed a gun at I.C. and demanded his belongings. I.C. believed that the group of men who robbed him and his friends was in possession of more than one gun. J.L. testified that one of the robbers pointed a gun at him while demanding that J.L. hand over his boots. T.M. testified that he saw men pointing guns at both I.C. and J.L. during the robberies.

Detective Sidhu testified that a video that investigators found on Alcaraz's phone, recorded on May 9, 2018, shows Alcaraz's hand, holding a silver revolver and "dry firing" the gun in his bedroom. The copper tips of live, small caliber bullets can also be seen in the video. When this video was played for I.C. during his conditional examination, I.C. testified that the revolver in the video looked similar to the revolver that was pointed at him during the robbery. Detective Sidhu further testified that when officers searched Alcaraz's bedroom on August 19, 2018, they found several spent shell casings and a nine-millimeter gun magazine that contained eight live rounds.

During closing arguments, the prosecutor discussed the gun-related evidence:

> "Now, Mr. Alcaraz had a video of a firearm in his room. If you look on the very bottom left of this [video], you see ammunition that had not been fired. If you look at the

38

photos of the ammunition that was in his room [when police searched it], you now see the expended shell casings. [¶] Now, I believe defense counsel, who's done an excellent job and is a very good defense attorney, will argue that, [l]ook, that's . . . an old video. Put it aside. [¶] My job as a prosecutor is to present you with all the evidence, and if I have a victim in a robbery case describing a firearm that is consistent with a firearm that is on his phone in his room, I'm going to present it to you. You may be, like, I'm going to disregard that. That's fine. I'm going to present it to you, though. [¶] And that's what he had in his own bedroom, dry firing that gun, evidence to support this information that [I.C.] didn't know."

2. *Analysis*

The same evidentiary standards that we set out in part III.B.2, *ante*, related to application of Evidence Code section 352 apply to Alcaraz's contention regarding the trial court's admission of firearm-related evidence. We reiterate for emphasis that we review the trial court's ruling under Evidence Code section 352 for an abuse of discretion. (*Leon, supra*, 61 Cal.4th at p. 597.)

Despite Alcaraz's contention to the contrary, the video found on Alcaraz's cell phone in which a hand is seen holding a silver revolver and dry firing the gun in his bedroom was relevant to prove the offenses charged in counts 7 and 8, which involved the August 12, 2018, robberies of J.L., I.C. and T.M., during which I.C. and J.L. were robbed at gunpoint. Specifically, I.C. testified that a silver revolver was used during the robbery. When asked whether the revolver was similar to a .44 Magnum, I.C. testified that the gun he saw "was smaller." I.C. was then showed the video, and he testified that the silver revolver seen on the video was "consistent with" the gun that he saw during the robbery. Thus, the video of Alcaraz's hand holding a gun that looked like the gun used in the robbery a few months prior to the robbery

39

tended to link Alcaraz to this robbery. Moreover, the probative value of the video was not outweighed by a danger of undue prejudice. The video is not the type of evidence that tended to evoke an emotional response, given its brevity, and the fact that it depicts only Alcaraz's hand and the dry firing of the gun. The most significant aspect of the video is the fact that it shows a gun that looked similar to the one that was pointed at I.C. during the robbery. There is nothing to suggest that the playing of the video required an undue consumption of time, or that it somehow created the possibility of confusion or misled the jury.

Alcaraz also contends that "any slight probative value that the video might have had" was "diminished" by the fact that the video was made at least two months before any of the robberies took place. However, the fact that the recording was made two months prior to the robbery in question does not render it distant or remote. Further, whether the two-month period between the recording of the video and the robbery at issue "diminish[es]" the probative value of the video evidence goes to the weight that one might give to the evidence; it does not mean that the video lacked sufficient probative value to outweigh potential prejudice. We also reject Alcaraz's contention that the video was extremely prejudicial because it was "highly likely to lead jurors to believe appellant had a propensity to commit gun crimes." Alcaraz argues that the video "linked him with urban gun violence" and "made him look like a thug." Nothing about the video is particularly violent or likely to inflame the passions of the jury; the video depicts a hand holding and dry firing a gun. To the extent that such evidence might be damaging, that is because it links Alcaraz to a firearm that looks like the one used during one of the robberies. The video cannot be said to have been likely to cause the jury to seek to punish Alcaraz merely out of an emotional reaction.

We also conclude that the trial court did not abuse its discretion in allowing Detective Sidhu to briefly discuss the fact that empty shell casings and a magazine containing live rounds were found in Alcaraz's bedroom. First, the presence of empty shell casing and a magazine with live rounds tended to demonstrate that Alcaraz had access to ammunition. Based on that fact, one could draw the reasonable inference that Alcaraz had access to a firearm other than the silver revolver. Even if the probative value of such evidence was limited, a court could reasonably conclude that the probative value was not outweighed by any possible prejudice; the testimony about this evidence was extremely brief, and testimony about the presence of ammunition is not likely to evoke an emotional response in jurors.

We therefore conclude that Alcaraz cannot demonstrate that the trial court abused its discretion under Evidence Code section 352 in admitting in evidence the video of a firearm found on Alcaraz's cell phone or in allowing testimony about ammunition found in his bedroom. Because we conclude that the trial court did not abuse its discretion in admitting the firearm-related evidence, we also conclude that Alcaraz has failed to show that the admission of this evidence violated his constitutional rights to a fair trial or due process (See, e.g., *People v. Fuiava* (2012) 53 Cal.4th 622, 670 [determination that trial court did not abuse its discretion under state law in admitting evidence over defendant's objections rendered meritless the related contention that the admission of this evidence violated defendant's constitutional right to a fair trial)]; *People v. Jablonski* (2006) 37 Cal.4th 774, 835 [where trial court did not abuse its discretion under Evid. Code, § 352, court necessarily rejects "the edifice of constitutional violation" that a defendant attempts to make based on that claim of evidentiary error].)

D. *There was no cumulative error with respect to the challenged evidence*

Alcaraz contends that even if any of the claimed evidentiary errors may be considered to be individually harmless, the "admission of the gang related evidence and the evidence of Alcaraz's possession of a firearm . . . had a synergistic effect of unfairly portraying appellant as a dangerous gangster," and therefore jointly amounted to prejudicial error. "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) Because we have found no evidentiary errors to cumulate, we conclude that the cumulative error doctrine does not require reversal of the judgment.

E. *The trial court did not err in declining to sever the theft and burglary counts pertaining to the Apple Store burglary from the robbery counts*

1. *Additional relevant background*

Prior to trial, Alcaraz moved in limine to sever the burglary and grand theft charges in counts 3 and 4 from the remaining counts, all of which pertained to the robberies that occurred on four different dates. Alcaraz asserted that counts 3 and 4, related to the Apple Store burglary, were "not connected together" with the remaining counts; he argued that the modus operandi differed, that the Apple Store burglary occurred on a separate date from any of the robberies, that "burglary is a completely different type of crime" from robbery, and that "the interests of justice require severance."

At the hearing on the motions in limine, the prosecutor argued that joinder was appropriate because the charges involved the same class of crimes, in that theft was an overarching element of each offense. The prosecutor also argued that the fact there was overlapping evidence that was to be presented "just buttresses the fact that this is the appropriate [case]" for

joinder. Among the evidence the prosecutor identified as being cross-admissible was the fact that in all of the crimes cell phones were stolen, and evidence tending to show that Alcaraz's group had "a method" and the "ability to flip cell phones that are stolen at the drop of a hat, essentially." The prosecutor also argued that evidence going to the various crimes was cross-admissible because "it's the same exact group that's working together . . . . You have Mr. Jackson, Mr. Smith, [Mr. Alcaraz], and Mr. Burton, the same four individuals. That's the same four individuals from the night of the [Y.S.] robbery, the same four individuals from the robbery of [C.A.]" The prosecutor added that another item of "overlapping evidence" is "the way they work together in the theft. They . . . all walk in there at the same time. They're concealing their face in some manner." With respect to the Apple Store burglary, the "team" did those things, and then "[t]hey all steal multiple items from the store, flee, . . . and then later sell the items and have hundreds of dollars in front of them." The prosecutor explained that, similarly, the robberies all took place at night, with a coordinated group attack. The victims could not identify who was involved, but it was "all a group working together in the exact same way."

The prosecutor also noted that all of the criminal events took place within a period of just over a month; the robberies occurred on July 7, August 3, August 12, and August 18, and the Apple Store incident occurred "right dab in the middle of these things," on July 11. Finally, the prosecutor argued that Alcaraz would not be prejudiced by joinder because the details involving the Apple Store incident were "way less egregious" than the details involving the robberies.

Defense counsel responded that the prosecutor was attempting to join a strong case with a weak case. According to the defense, the prosecutor had a

43

strong case against Alcaraz with regard to the Apple Store burglary, given that there was a surveillance video that essentially showed Alcaraz committing the crime. Defense counsel added that he would be conceding Alcaraz's guilt on counts 3 and 4 during trial. However, counsel believed that joinder would prejudice Alcaraz because the jury would use the Apple Store evidence "as sort of inappropriate character evidence" and convict Alcaraz of the other crimes because he committed the Apple Store crimes. Counsel argued that the robberies were different from the Apple Store burglary in that they involved violence, while the Apple Store burglary did not, and he contended that the Apple Store burglary was, in effect, akin to shoplifting and was "not even close to being as serious as a robbery." Defense counsel also stated that he believed the evidence pertaining to the robberies and the evidence from the Apple Store burglary was not cross-admissible.

The trial court interjected that it believed the prosecutor's theory of joinder was not simply the cross-admissibility of evidence, but rather "the 1101(b) purposes, including common scheme and plan, which requires less similarity if it was excised out through a separate trial." The prosecutor confirmed the court's understanding, and argued that "stealing phones and flipping phones for money is not something your average person knows how to do. This evidence shows they know how to do that and they're actively doing it in the timeline of this offense." The prosecutor responded to defense counsel's claim that he was attempting to bootstrap a weak case to a strong case by explaining that he had evidence of Alcaraz on video bragging about committing the robberies of the individual victims and that as a result, this was "not a weak case and a strong case."

The trial court denied Alcaraz's motion to sever the robbery counts from the burglary counts. The court explained, "I do agree that they're the

44

same class of crimes. I don't find cross-admissible evidence, at least in what's been proffered. But I think there's a strong argument that could be an 1101(b) offer or request, at least, for common scheme and plan and also for showing that these four worked together, the manner that they worked together. But I'm more focused on the 352 analysis. And I don't see a weak case being joined to a strong case, at least to a degree that would give me concern. [¶] And for the reasons that have been articulated, a shoplift compared to a robbery is not at all going to inflame the passions of the jury in an unfair way. If this was in reverse, that argument would be stronger. There is a preference for joinder, and in the absence of a reason to sever, joinder is proper; so I will decline to sever those counts."

2. *Analysis*

" 'The law favors the joinder of counts because such a course of action promotes efficiency.' " (*People v. Scott* (2015) 61 Cal.4th 363, 395.) Under section 954, crimes are triable together if they are either " 'connected together in their commission,' " or are " 'of the same class.' " (§ 95414; *People v. Soper* (2009) 45 Cal.4th 759, 771-772 (*Soper*).) If charges satisfy either of section 954's two requirements, the presumption is that they will be tried together, as any other course wastes public resources and delays justice. (*Soper*, at pp. 771-772.) Thus, once section 954 is satisfied, the People have no burden of justifying joinder; rather, for charges to be tried separately, the defense must "clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried." (*Soper*, at p. 773.)

Where charges have been properly joined and a defendant is seeking to sever the counts for trial, " '[t]he burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.' " (*Soper, supra*, 45 Cal.4th at p. 773.) This

45

is because "[u]nlike what occurs in situations involving the admissibility of uncharged misconduct—in which the People bear the burden of establishing that the evidence has substantial probative value that clearly outweighs its inherent prejudicial effect—by contrast, in the context of properly joined offenses, '[t]he burden is reversed.' [Citation.]" (*Ibid*.) " 'When the offenses are [properly] joined for trial the defendant's guilt of all the offenses is at issue and the problem of confusing the jury with collateral matters does not arise. The other-crimes evidence does not relate to [an] offense for which the defendant may have escaped punishment. That the evidence would otherwise be inadmissible [under Evidence Code section 352] may be considered as a factor suggesting possible prejudice, but countervailing considerations [of efficiency and judicial economy] that are not present when evidence of uncharged offenses is offered must be weighed in ruling on a . . . motion [to sever properly joined charges]. *The burden is on the defendant therefore to persuade the court that these countervailing considerations are outweighed by a substantial danger of undue prejudice*.' [Citations]" (*Id*. at pp. 773-744.) Further, "[n]ot only is the burden allocated differently in cases involving properly joined charges as compared with cases involving the introduction of uncharged misconduct, but the *nature of the abuse of discretion standard—and the ensuing method utilized to analyze prejudice, undertaken to determine whether a trial court abused its discretion in a specific case*—also are significantly different from what is employed in determining whether a trial court erred in allowing the introduction of evidence of uncharged misconduct." (*Id*. at p. 774, italics added.)

"In determining whether a trial court abused its discretion under section 954 . . . 'we consider the record before the trial court when it made its ruling.' [Citation.] Although our assessment 'is necessarily dependent on the

particular circumstances of each individual case, . . . certain criteria have emerged to provide guidance in ruling upon and reviewing a motion to sever trial.' [Citation.]" (*Soper, supra*, 45 Cal.4th at p. 774.) "First, we consider the cross-admissibility of the evidence in hypothetical separate trials. [Citation.] If the evidence underlying the charges in question would be cross-admissible, that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges. [Citation.] Moreover, even if the evidence underlying these charges would not be cross-admissible in hypothetical separate trials, that determination would not itself establish prejudice or an abuse of discretion by the trial court in declining to sever properly joined charges. [Citation.]" (*Id.* at pp. 774-775.)[28] Instead, where a court determines "that evidence underlying properly joined charges would *not* be cross-admissible," that court "proceed[s] to consider 'whether the benefits of joinder were sufficiently substantial to outweigh the possible "spill-over" effect of the "other-crimes" evidence on the jury in its consideration of the evidence of defendant's guilt of each set of offenses.' [Citations.]" (*Soper, supra*, at p. 775.) In making such an assessment, a court is to "consider three additional factors, any of which— combined with [the] earlier determination of absence of cross-admissibility— might establish an abuse of the trial court's discretion: (1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or

---

28      Section 954.1 codifies this idea, providing that where properly joined charges are of the same class, the fact that the evidence underlying those charges would not be cross-admissible at hypothetical separate trials is, standing alone, insufficient to establish that a trial court abused its discretion in refusing to sever those charges.

47

all of the charges; or (3) whether one of the charges (but not another) is a capital offense, or the joinder of the charges converts the matter into a capital case. [Citations.]" (*Ibid.*) The court then balances "the potential for prejudice to the defendant from a joint trial against the countervailing benefits to the state." (*Ibid.*)

Alcaraz was charged with burglary and theft offenses in counts 3 and 4, and robbery offenses in the remaining counts. Despite Alcaraz's argument to the contrary, it is clear that these offenses are of the same "class of crimes." (See *People v. Koontz* (2002) 27 Cal.4th 1041, 1075 [offenses sharing the common characteristic of the wrongful taking of another's property fall within the same class]; *People v. Biehler* (1961) 198 Cal.App.2d 290, 293 ["robbery and burglary are of the 'same class of crimes,' within the meaning of section 954"].) As a result, there was a presumption favoring the joinder of the counts at issue for trial. (See *Soper, supra*, 45 Cal.4th at pp. 771-772 [once either of section 954's requirements are met, presumption in favor of joint trial is triggered].)

We therefore first consider whether the evidence of the different offenses would be cross-admissible in hypothetical separate trials. We are not convinced that there was no cross-admissible evidence at issue, despite the trial court's suggestion otherwise. Specifically, evidence relating to the fact that Alcaraz was present in the Infiniti when it was stopped on August 19, 2018 was cross-admissible, given that the same vehicle was involved in all of the crimes, including the burglary of, and thefts from, the Apple Store. In addition, evidence regarding the fact that the principal items that were stolen were cell phones, and that Alcaraz and the other perpetrators knew how to sell the stolen phones quickly, would have been cross-admissible in hypothetical separate trials. However, even if we assume for argument's

sake that the evidence pertaining to the robbery counts would not be cross-admissible with respect to counts 3 and 4, the trial court acted well within the bounds of its discretion in denying Alcaraz's motion to sever.

We reach this conclusion by considering the three factors identified in *Soper*, which, when "combined with [an] earlier determination of absence of cross-admissibility—might establish an abuse of the trial court's discretion." (*Soper, supra*, 45 Cal.4th at p. 775.) First, we consider whether some of the charges are particularly likely to inflame the jury against the defendant. In this regard, we cannot conclude that any of the charges were particularly inflammatory. Although Alcaraz suggests that the robberies were more inflammatory than the Apple Store burglary, given that the robberies tended to involve some degree of violence, we cannot say that any of the charges was so inflammatory as to present a risk of heightening the jury's passions to such a degree as to cause undue prejudice. Nor does this case involve a capital offense, or a situation in which joinder would convert the case into a capital case. Thus, neither of these factors weighs against the benefits of joinder of the charges alleged here.

The final consideration—i.e., whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges—also does not persuade us that the benefits of joinder would be outweighed by prejudice to Alcaraz. Alcaraz suggests that the robberies presented a weaker case than the Apple Store burglary case. We agree, but only to a point. Although the evidence supporting the robbery charges was *relatively* weaker than the evidence supporting the Apple Store burglary related offenses because the Apple Store burglary was recorded on surveillance video that depicted the perpetrators committing the offenses charged in counts 3 and 4, the record discloses that

49

the evidence supporting all of the charged offenses was strong. While the evidence of Alcaraz's guilt with respect to the Apple Store burglary was so strong that defense counsel made the strategic decision to admit Alcaraz's guilt as to counts 3 and 4, this does not mean that the evidence of Alcaraz's guilt with respect to the robberies was weak. Alcaraz appeared in multiple recorded videos in which he is seen bragging about the robberies. Some of the items taken from one victim were found in Alcaraz's bedroom, and he was found to be in possession of other items taken during the robberies at the time the Infiniti was stopped. "[I]t always is possible to point to individual aspects of one case and argue that one is stronger than the other. A mere imbalance in the evidence, however, will not indicate a risk of prejudicial 'spillover effect,' militating against the benefits of joinder and warranting severance of properly joined charges." (*Soper, supra*, 45 Cal.4th at p. 781.) There may have been some slight imbalance in the evidence as between the Apple Store offenses and the robberies, but this record does not indicate that the joinder of the offenses for trial amounted to bootstrapping a weak case to a strong case.

In sum, the crimes are of the same class, some evidence was cross-admissible, and, even if we assume that none of the evidence was cross-admissible, none of the offenses was particularly inflammatory, and the record does not indicate that a weaker case was joined with a strong case, or that a capital offense was at issue. Given this record, we conclude that the trial court did not abuse its discretion in determining that the benefits of joinder were substantial enough to outweigh any possible minimal spillover prejudice to Alcaraz that may have resulted from joinder. We therefore reject Alcaraz's contention that the trial court abused its discretion in denying Alcaraz's severance motion.

50

## IV.

## DISPOSITION

The judgment is affirmed.

AARON, Acting P. J.

WE CONCUR:

DATO, J.

BUCHANAN, J.